# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| H.B. Fuller Co., <br><br> Plaintiff, <br><br> v. <br><br> Timothy Hamm, <br><br> Defendant. | Case No. 17-cv-5562 (DWF/HB) <br><br> **ORDER** |

HILDY BOWBEER, United States Magistrate Judge

This matter is before the Court on H.B. Fuller's Motion to Amend [Doc. No. 37]. H.B. Fuller alleges that Timothy Hamm, a former sales manager for the company, breached contractual and common law duties he owed to the company and violated state and federal trade secrets laws when he improperly collected H.B. Fuller's proprietary information and used it for the benefit of his new employer, IFS Industries, Inc. (Compl. [Doc. No. 1].) By this motion, H.B. Fuller seeks to add a number of new factual allegations and two new claims: a claim for breach of Hamm's non-competition agreement and a claim for specific performance of that agreement. For the reasons stated below, the Court will grant the motion in part, allowing H.B. Fuller to amend its complaint to add the new factual allegations, but will deny the motion without prejudice as to the new claims.

## I. FACTUAL ALLEGATIONS AND PROCEDURAL BACKGROUND

H.B. Fuller is a company that develops, manufactures, markets, and sells adhesives and specialty chemical products. (Compl. ¶ 6 [Doc. No. 1].) On February 1, 2017, Hamm began working for H.B. Fuller as a Geographic Sales Manager in the company's Durable Assembly business in North America. (*Id.* ¶ 14.) As a condition of his employment, Hamm executed a Non-Disclosure and Non-Competition Agreement ("NDA") in which he agreed to, among other things, maintain the secrecy of H.B. Fuller's confidential information, refrain from using the company's confidential information after ending his employment with H.B. Fuller, and refrain from competing against H.B. Fuller for the twelve-month period following the termination of his employment with the company. (Compl., Ex. 1 at 5 [Doc. No. 1-1].)

Among the confidential and proprietary information H.B. Fuller seeks to protect through its NDA is its confidential model for pricing its adhesive products, including the "contribution margin" on particular products for particular customers, and its plans for future pricing and margins as to particular products or customers. It alleges that access to this information would, among other things, allow a competitor in the "fiercely competitive" adhesive market to identify customers or products with higher margins, allowing them to undercut H.B. Fuller's pricing for specific customers or across the board, as well as to target new customers. (Compl. ¶¶ 7-9.)

The operative Complaint goes on to allege that on August 7, 2017, roughly six months after beginning his position with H.B. Fuller, Hamm notified the company that he

2

was leaving his position to accept a new job with a competitor. (*Id*. ¶ 24.) Although his then soon-to-be employer directly competes with H.B. Fuller in the Durable Assembly business, Hamm represented that he would honor the commitments he made to H.B. Fuller in his NDA. (*Id*. ¶ 26.) Hamm's last day as an employee of H.B. Fuller was on August 25, 2017. (*Id.* ¶ 30.) As part of his transition out of his employment with H.B. Fuller, Hamm completed a termination checklist in which he stated he had turned in all of the company files, materials, records, and property in his possession. (*Id.* ¶¶ 27-28.)

After Hamm left his position, H.B. Fuller retained a computer forensics consulting firm to examine and analyze the data on Hamm's company laptop as part of its standard operating procedures. (*Id.* ¶¶ 32-33.) The forensic examination showed that on August 18, 2017, the same day that Hamm notified the company that he would be leaving to accept another position, Hamm used a personal email account to send emails from his company laptop while he had access to H.B. Fuller files. (*Id.* ¶ 35.) It also showed that the same day, he inserted a USB flash drive into his company laptop, and also that he "accessed"[1] a number of company files in the "Documents" directory of his laptop, although the Complaint does not specifically allege that he transferred or copied any of those files onto the USB device or elsewhere. Among the files he accessed that day was an Excel spreadsheet named "Hamm Copy of targets 2017" (*id.*), which listed dozens of H.B. Fuller customers or potential customers as well as information about many of them,

---

[1] The Court puts the term "accessed" in quotes because the Complaint provides no other information regarding what "accessed" means, including whether it was opened, read, copied, transferred, modified, etc.

3

including product orders, product volume, pricing, contribution margins, and revenue information. (*Id.* ¶ 36.)

Based on these findings, H.B. Fuller concluded that Hamm had taken confidential information from the company in violation of his NDA obligations. (*Id.* ¶ 42.) Shortly thereafter, on December 26, 2017, H.B. Fuller filed a six-count complaint against Hamm asserting causes of action for (1) breach of contract, (2) specific performance, (3) trade secret misappropriation under the Defend Trade Secrets Act, (4) trade secret misappropriation under the Minnesota Uniform Trade Secrets Act, and (5) breach of duty of loyalty and confidentiality. (*Id*. ¶¶ 51-91.) It also sought injunctive relief. (*Id.*)

H.B. Fuller moved for a temporary restraining order (TRO) to require Hamm to produce all personal electronic storage devices, storage locations, and personal accounts for forensic examination by an independent third party. (Mot. TRO [Doc. No. 6].) Rather than litigating over the TRO, the parties stipulated to an order governing preliminary forensic analysis, which was entered on January 23, 2018. (Stipulation [Doc. No. 18]; Order Governing Preliminary Analysis [Doc. No. 25].) Pursuant to the parties' agreement, Pixley Forensics conducted an initial preliminary forensic review and analysis of Hamm's personal electronic storage devices and accounts on February 5, 2018. (Stipulation at 2.) The results of that review and analysis give rise to the instant motion.

H.B. Fuller's Proposed Amended Complaint ("PAC") clarifies that Hamm's new employer is IFS Industries ("IFS") and alleges that Pixley Forensics concluded Hamm not only retained possession of H.B. Fuller confidential information and property after he

terminated his employment with the company, but that he "accessed" some of that information after he began his employment with IFS.[2] (*Id.* ¶ 50.) Specifically, Pixley Forensics found that USB drives in Hamm's possession contained 367 data files that were also within the "Documents" directory he accessed on his company laptop on August 18, 2017; that his personal emails contained 33 H.B. Fuller data files that were also in that directory; and that his iPhone held 95 H.B. Fuller data files that were also in that directory. (*Id.* ¶ 51.) Pixley Forensics also found the "Hamm Copy of targets 2017" Excel file in Hamm's personal email account. (*Id.* ¶ 54.)

Pixley Forensics also concluded that Hamm "accessed" at least 31 of the H.B. Fuller data files on his USB devices over the course of four occasions in September and December of 2017. (*Id.* ¶¶ 55-56.) Pixley Forensics reported, however, that Hamm did not use any of his own devices to access those files, as a result of which H.B. Fuller alleges it is reasonable to conclude he used his IFS company laptop to access the files on those occasions. (*Id.* ¶ 59.) H.B. Fuller alleges that one of those files pertains to an H.B. Fuller customer identified as "Customer A," and two of those files pertain to another H.B. Fuller customer identified as "Customer B." (*Id.* ¶¶ 57-58.) The Customer A file and one of the Customer B files was "accessed" on December 5, 2017, and the other Customer B file was "accessed" on December 19, 2017. (*Id.*) As to the file that pertained to Customer A, the PAC alleges it contained "information relating to pricing and rebate programs," but there is no equivalent allegation regarding the two files

---

[2] Again, the Court puts the term "accessed" in quotes because the PAC provides no additional information regarding what "accessed" means.

pertaining to Customer B.  (*Id.*)  H.B. Fuller further alleges generally that some of the files Hamm "accessed" in September and December contain "highly-sensitive, confidential and proprietary information" regarding significant customers of its Durable Assembly business, "including information related to Customers A and B and specifically relating to pricing and rebate programs."  (*Id.* ¶ 61.)  It goes on to assert that the information Hamm "accessed" after he joined IFS would allow a competitor such as IFS to know H.B. Fuller's confidential information for various customers and potential customers, including product volumes, pricing, plans, "contribution margins," and revenues.  (*Id.* ¶ 70.)

The PAC further alleges that IFS "recently"[3] approached Customer B to run trials of an adhesive product in competition with an H.B. Fuller product, and that IFS proposed a pricing structure that was "just below H.B. Fuller's pricing structure" for that product.  (*Id.* ¶ 64.)  H.B. Fuller asserts that IFS's recent strategic bid for Customer B's business, taken together with Hamm's post-termination access of H.B. Fuller files, demonstrate that Hamm is competing with H.B. Fuller in the Durable Assembly business in violation of Section B(4) of his NDA by sharing H.B. Fuller's confidential information with IFS salesmen and assisting IFS in pursuing Customer B's business.  (*Id.* ¶¶ 65-66.)  The PAC also alleges that Hamm's stated position at IFS is "a step down" from his position at H.B. Fuller, and that H.B. Fuller "is informed and reasonably believes" that Hamm's position is only a "means to demonstrate facial compliance with his non-compete obligations"

---

[3] The PAC does not indicate whether the overture to Customer B was made before or after December 5 or 19, 2017, when it alleges Hamm accessed the Customer B files.

6

when in actuality Hamm is engaged in the sale of Durable Assembly products in direct competition with H.B. Fuller. (*Id.* ¶ 61.)

## II. MOTION TO AMEND

By this motion, H.B. Fuller seeks to amend its complaint to include additional factual allegations and, based on those allegations, to add claims for breach of contract and specific performance premised on violation of Hamm's non-compete obligations under Section B(4) of the NDA. H.B. Fuller contends that it did not include those claims in its initial complaint because it lacked evidence at the time to support them, even though the company suspected that Hamm had improperly assisted his new employer to compete against H.B. Fuller in the Durable Assembly business. Now, after the recent forensic examination, H.B. Fuller asserts it has sufficient evidence to support its claim that Hamm improperly competed against the company and accordingly moves to add claims under Section B(4) of the NDA.

### A. Legal Standard

A court should freely grant leave to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). However, "there is no absolute right to amend," and a court may deny leave to amend "based upon a finding of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies in previous amendments, undue prejudice to the non-moving party, or futility." *Baptist Health v. Smith*, 477 F.3d 540, 544 (8th Cir. 2007) (citation omitted).

When a party challenges a proposed amendment on futility grounds, the Court considers whether the amendment could withstand a Rule 12(b)(6) motion to dismiss. *Cornelia I. Crowell GST Trust v. Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008). "An amendment is futile if the amended complaint could not withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *Rickmyer v. Browne*, 995 F. Supp. 2d 989, 1001 (D. Minn. 2014). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court accepts all alleged facts as true and affords Plaintiff all reasonable inferences arising from the allegations. *Butler v. Bank of Am., N.A.*, 690 F.3d 959, 961 (8th Cir. 2012). But the factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. If "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal,* 556 U.S. at 679 (internal quotation omitted). Put another way, if the facts pled are "merely consistent with the defendant's liability, it stops short of the line between possibility and plausibility." *Id.* at 678.

**B. Discussion**

Hamm does not argue here that H.B. Fuller unreasonably delayed in filing its motion to amend. Nor does Hamm appear to object to the proposed amendments insofar as the additional factual allegations based on the forensic examination conducted after the

8

original complaint was filed may be pertinent to the causes of action pled in that complaint. Rather, Hamm's opposition to the motion to amend is that the proposed new causes of action for breach of Hamm's non-compete obligations and for specific performance of those contractual obligations (Counts VI and VII, respectively [Doc. No. 37-1 at ¶¶ 113-127]) should be rejected as futile because H.B. Fuller fails to link any of Hamm's alleged actions to a breach of his non-compete obligations.

"To establish a breach-of-contract claim, a plaintiff must show that (1) a contract was formed; (2) the plaintiff performed any conditions precedent; and (3) the defendant breached the contract." *Taxi Connection v. Dakota, Minnesota & E. R.R. Corp.*, 513 F.3d 823, 826 (8th Cir. 2008) (quoting *Commercial Assocs., Inc. v. Work Connection, Inc.*, 712 N.W.2d 772, 782 (Minn.Ct.App.2006)). "When a party breaches a contract, a Court may, in certain circumstances, order specific performance of a contract duty." *Minnesota Vikings Football Stadium, LLC v. Wells Fargo Bank, Nat'l Ass'n*, 193 F. Supp. 3d 1002, 1014 (D. Minn. 2016).

H.B. Fuller's proposed new claims specifically point to Sections B(4)(a)(2) and B(4)(a)(5) of the NDA, in which Hamm covenanted not to solicit or help others solicit H.B. Fuller's customers for a one year period after his employment, and not to perform work that would likely result in him using H.B. Fuller's confidential information to compete against the company within one year after his employment. (Proposed Am. Compl. ¶¶ 113-127.) Those sections provide as follows:

> (a) During the term of my employment and for twelve (12) months after termination [ ] of my employment with H.B. Fuller . . .

9

> (2) I will not directly or indirectly identify, contact, make sales calls on, make introductions to, accept business from, provide services, assistance or consulting to, any entity or person who at any time within the two (2) year pe1iod prior to my employment termination (i) was a customer of H.B. Fuller with whom I had direct or indirect contact; (ii) was identified as a prospective customer of H.B. Fuller by me, at my direction or by another H.B. Fuller employee or contractor; (iii) was a customer or prospective customer to whom I directly or indirectly rendered assistance of any kind; or (iv) was a customer whose account I supervised or serviced for H.B. Fuller. . .
>
> \* \* \* \* \* \*
>
> (5) I will not serve in any capacity or have interest in, whether as an owner, employee, consultant, or otherwise, any entity, organization or person engaged in the development, use, production or sale of any Conflicting Product, where I will be in a position where performance of my job duties or my obligations would likely result in use or disclosure of Confidential Information or where the entity or organization has requested or required my use or disclosure of Confidential Information.

(Compl. Ex. 1 at 5-6 [Doc. No. 1-1].)[4]

H.B. Fuller argues that the PAC alleges facts to support each element of a claim for breach of these provisions of the NDA because it pleads the existence of the contract between Hamm and the company (Proposed Am. Compl. ¶¶ 15-24, 113-21); alleges that H.B. Fuller has performed all of the conditions precedent under the NDA (*Id.* ¶ 115); and sets forth detailed factual allegations showing that Hamm breached his non-compete obligations under Section B(4)(a)(2) and (5) (*Id.* ¶¶ 25-66, 113-21). In addition, H.B. Fuller asserts it has properly pled its claim

---

[4] The NDA, which was Exhibit 1 to H.B. Fuller's original complaint, was not attached to the PAC. However, that appears to have been an oversight, as the PAC carries forward the reference to that exhibit. [Doc. No. 37-1 at ¶ 15.]

for specific performance because that remedy is available to rectify Hamm's breach of his non-compete obligations under the NDA.

Hamm argues, however, that H.B. Fuller has failed to state a plausible claim for breach of Section B(4) of the NDA because the facts pled do not show that Hamm solicited a customer or aided IFS in competing against H.B. Fuller. On the contrary, Hamm contends, the most H.B. Fuller alleges is that (1) he accessed files pertaining to two anonymous customers after he began working for IFS, and (2) IFS "recently" proposed to one of those customers to run trials of an adhesive product at a slightly lower price than H.B. Fuller offered. Hamm emphasizes that H.B. Fuller does not allege that the files were accessed prior to IFS's proposal to Customer B, and only vaguely alleges that the files "pertained to Customer B" or "included information about Customer B," but never alleges that those files contained price, margin, or product information. That was not an oversight, Hamm observes, because the files in fact did not contain information that would be helpful to IFS in underbidding H.B. Fuller. On the contrary, the first file pertaining to Customer B was a 2008 letter regarding general warranty-related information, and the second file pertaining to Customer B was a 2014 document containing a technical service request. (Def.'s Mem. Opp'n Mot. Amend at 8 [Doc. No. 42].)[5] Hamm also points out that H.B. Fuller does not

---

[5] Hamm did not submit with his memorandum a declaration in support of this or other representations about the contents of or Hamm's actions with regard to the various data files that are the subject of this motion. Even if it had, the Court could not consider facts

allege that Customer B could not and did not itself disclose H.B. Fuller's pricing structure to IFS for the purpose of soliciting more favorable terms.

Hamm additionally points out that H.B. Fuller does not and cannot allege that the "Hamm Copy of targets 2017" file, the file that *does* contain pricing information, links Hamm to Customer B, because Customer B is not one of the customers listed in the file, and in any event, H.B. Fuller does not allege in either its original Complaint or in the PAC that Hamm accessed it after he left Fuller's employ, or that it includes any information about Customer A or Customer B. Indeed, Hamm argues, that file was in his personal email account because his manager at H.B. Fuller asked Hamm to send him the file before he left the company and Hamm's company email account had already been discontinued, leaving him no choice but to use his personal account for that purpose. (Def.'s Mem. Opp'n Mot. Amend at 3 [Doc. No. 42].) That the file remains in his personal email account is also meaningless, Hamm notes, because the stipulated order forbids Hamm to delete or change any of the ESI on any of his devices or in any of his accounts. (*Id.* at 3, n. 1, citing Doc. No. 19 ¶ 2.) Thus, Hamm argues that his alleged access of H.B. Fuller files does not provide even circumstantial

---

from outside the pleadings or engage in factfinding on the merits of Plaintiff's factual allegations in determining whether the PAC would withstand a motion to dismiss for failure to state a claim. However, the statements do help to illuminate Hamm's argument that the facts H.B. Fuller does allege, particularly when compared with the facts it does not allege, are equally consistent with an innocent explanation and are therefore insufficient to raise the claim that Hamm is assisting IFS in competing against H.B. Fuller for Customer B's business above the speculative level. The Court considers them in that light.

evidence of him competing against H.B. Fuller. Therefore, because none of the documents he purportedly accessed after he left H.B. Fuller would have assisted him or IFS in developing pricing for Customer B, and H.B. Fuller offers no additional facts to show that Hamm actually assisted IFS in competing for Customer B's business, let alone how he did so, Hamm argues that H.B. Fuller has failed to supply an adequate factual basis for its allegation that he violated Section B(4) of his NDA by competing against his former employer.

Hamm additionally argues the timeline of H.B. Fuller's allegations make them particularly implausible. The instant action was filed more than six months ago, and a short while after that, Hamm agreed to a forensic analysis of all of his personal electronic devices and accounts. Therefore, Hamm has been aware since December 2017 that his actions at IFS are being scrutinized and he has cooperated with H.B. Fuller's discovery efforts. Despite that, H.B. Fuller alleges he nevertheless proceeded to deliberately violate his covenant not to compete with full knowledge that doing so would likely be discovered and could result in legal consequences concomitant with the instant action. Harm argues that common sense would reject any inference that he would so brazenly violate his non-compete obligations while in the midst of litigation with his former employer.

Hamm lastly argues that H.B. Fuller's claim for breach of contract fails because he has not pled any facts regarding actual damages to H.B. Fuller caused by his alleged breach. He cites *Gen. Mills Operations, LLC v. Five Star Custom*

*Foods, Ltd.*, 703 F.3d 1104 (8th Cir. 2013) for the proposition that "[a] successful breach-of-contract claim under Minnesota law has four elements: (1) formation of a contract; (2) performance by plaintiff of any conditions precedent; (3) a material breach of the contract by defendant; and (4) damages. *Id.* at 1107 (citing *Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F.Supp.2d 951, 961 (D. Minn. 2000)). *See also Jensen v. Duluth Area YMCA*, 688 N.W.2d 574, 578–79 (Minn. Ct. App. 2004) ("A breach of contract claim fails as a matter of law if the plaintiff cannot establish that he or she has been damaged by the alleged breach"). Here, Hamm argues the PAC is devoid of factual allegations of damages resulting from Hamm's alleged breach of his non-compete obligations. For instance, Hamm points out that H.B. Fuller does not state it actually lost business from Customer B to IFS on account of Hamm's alleged involvement in the competition. H.B. Fuller also does not allege it lost profits because it was forced to lower its prices to compete against IFS. Instead, H.B. Fuller states conclusorily that it "has suffered, and continues to suffer, significant damages" as a "direct result of Hamm's breaches of his non-compete obligations." (Proposed Am. Compl. ¶ 119.) Hamm argues this is insufficient to support the essential element of damages, and that the proposed claim for breach of contract must be rejected for this reason alone.

### C. Analysis

To state a claim for breach of a non-compete agreement, a complaint must contain "well-pleaded facts [that] permit the Court to infer more than the mere possibility of

misconduct." *CGB Diversified Servs., Inc. v. Mills*, No. 4:15-cv-291, 2015 WL 12880462, at *3 (E.D. Ark. Nov. 9, 2015). Here, H.B. Fuller adequately pleads the first and second elements of a claim for breach of contract by alleging that a Hamm executed a non-compete contract with H.B. Fuller, and that H.B. Fuller complied with its own obligations under that contract. (Proposed Am. Compl. ¶¶ 15-24, 113-21.)

The more difficult question is whether H.B. Fuller adequately pleads facts to support the third element, that Hamm actually breached his non-compete obligations. H.B. Fuller alleges that Hamm retained possession of more than 495 confidential H.B. Fuller files after he left the company, and that many of those files contained confidential company information that would be valuable to IFS. (*Id.* ¶¶ 50-52, 61, 70.) That, by itself, supports the original claim that Hamm retained confidential information, but not that he used it for the purpose of competing with his former employer. H.B. Fuller further alleges that Hamm "accessed" a total of 31 of those files over the course of four separate occasions while employed by IFS using an IFS-issued laptop. (*Id.* ¶¶ 56, 59.) But H.B. Fuller never alleges specifically what "accessed" means in this context. Moreover, while it asserts somewhat ambiguously that some of the files Hamm accessed on those occasions contained highly sensitive and confidential information "regarding significant Durable Assembly customers, including information related to Customers A and B and specifically relating to pricing and rebate programs" (*id.* ¶ 61), the PAC never directly describes the two Customer B files directly as confidential or sensitive, and never states that they contained pricing information. In fact, the paragraph that most directly

15

discusses information regarding Customer B is notably devoid of any allegation that Hamm actually accessed confidential or sensitive information of any kind regarding Customer B:

> Hamm was well aware of H.B. Fuller's pricing structure for sales of the product(s) to Customer B, including the contribution margin for the product(s). Moreover, Hamm had access to and/or retained information about H.B. Fuller's pricing history and strategy as to this customer after he left his H.B. Fuller employment. Such information would allow a competitor such as IFS to structure its pricing for this product so that it was just below H.B. Fuller's. Finally, the information on the USB drive that Hamm accessed in September and December 2017 included information about Customer B.

(Proposed Am. Compl. ¶ 65.)

Thus, while the PAC alleges Hamm "was well aware" of H.B. Fuller's pricing structure for Customer B, that he "had access to and/or had retained information about pricing for Customer B and that such information could be used by a competitor to H.B. Fuller's competitive disadvantage, the PAC fails to close the loop with any allegation that Hamm actually accessed or used any of that sensitive information about Customer B. Moreover, H.B. Fuller does not and probably could not credibly allege that the only possible way that IFS could have come up with proposed pricing for Customer B that was "just below" H.B. Fuller's pricing was by using confidential pricing information it obtained from Hamm.

The question, then, is whether it is enough to support a plausible inference that Hamm has violated the non-compete provisions of his NDA simply to allege that after he left H.B. Fuller and joined IFS he "accessed" a total of 31 files on a total of four different

occasions, some of which contained confidential and sensitive H.B. Fuller information regarding significant H.B. Fuller Durable Assembly customers, including information relating to pricing and rebate programs.  At its core, H.B. Fuller's argument is that if

> (1) Hamm has several hundred H.B. Fuller files that he should not have retained after his employment with H.B. Fuller ended,
>
> (2) he "accessed" 31 of those files using an unknown device after his employment ended (but there is no statement about what "accessed" means),
>
> (3) H.B. Fuller is not aware of any legitimate reason for Hamm to "access" any of those files after his employment ended,
>
> (4) some of the files Hamm "accessed" contain confidential and sensitive H.B. Fuller information, including pricing information,
>
> (5) two of the files he "accessed" relate to Customer B (but there is no description of the content of those files),
>
> (6) IFS made a "recent" proposal to Customer B with pricing that undercut H.B. Fuller's pricing (but there are no allegations of Hamm's direct involvement in that approach and no allegations supporting an inference that assistance from Hamm was the only means by which IFS could have made that proposal[6]), and
>
> (7) the information Hamm accessed, and/or the information Hamm knows independently by reason of his tenure and position at H.B. Fuller, if used, would enable him to help IFS do significant competitive harm to H.B. Fuller,

then one can reasonably draw the inference that Hamm has not only breached his agreement not to retain H.B. Fuller confidential information (the subject of the original

---

[6] As already noted, the PAC leaves open the possibility that pricing information could have come from Customer B directly.  But in addition, the PAC identifies a number of other former key H.B. Fuller Durable Assembly personnel who have moved to IFS. (Proposed Am. Compl. ¶ 29.)

17

complaint) but has also breached his non-compete agreement (the new claims alleged in the PAC).

After careful consideration, the Court concludes that although the new allegations in the PAC are suggestive, and although they reinforce H.B. Fuller's existing claims concerning Hamm's possession of H.B. Fuller confidential information, they are only "consistent" with a breach of Hamm's non-compete obligations; they are not sufficient to permit the Court "to infer more than the mere possibility of misconduct" with regard to those non-compete obligations. In other words, as to the proposed new claims, the PAC "has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal,* 556 U.S. at 679 (internal quotation omitted). Accordingly, the motion to amend the complaint should be denied insofar as it seeks to add new counts for breach of Hamm's non-compete obligations under the NDA and for specific performance of the NDA as to those obligations.[7]

---

[7] For the sake of clarity as to the basis of its ruling, the Court does not find that H.B. Fuller's failure to allege the specific damages that flowed from Hamm's alleged breach of the non-compete agreement would defeat its motion to amend if the other elements were adequately pleaded. The Minnesota Supreme Court has "recognized that the plaintiff may not have to allege that the breach caused damages in order to state a claim for breach of contract," *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011). Based on that Minnesota state law precedent, courts in this District have held that "at the pleading stage, the plaintiff does not need to plead damages for a breach of contract." *Forest Lake Facilities, LLC v. Wells Fargo Bank, N.A.*, No. CV 17-1766 (DWF/TNL), 2017 WL 4736716, at *3 (D. Minn. Oct. 19, 2017); *see also Arctic Cat, Inc. v. Polaris Indus. Inc.*, No. CIV. 13-3579 JRT/FLN, 2014 WL 5325361, at *19 (D. Minn. Oct. 20, 2014). Here, H.B. Fuller has pled that as a direct and proximate result of Hamm's competing against the company, H.B. Fuller has suffered, and continues to suffer, significant damages. (Proposed Am. Compl. ¶ 119.) Therefore, the Court does not base its decision to deny H.B. Fuller's motion on the ground that it failed to plead

However, as previously noted, the new factual allegations also bear in large part on the causes of action in the original Complaint, and Hamm offers no reason why the Complaint should not be amended to include them. Furthermore, the Court has noted that the factual allegations are at least consistent with a claim that Hamm breached his non-compete agreement, and it may be that in the course of discovery in this case, additional information will be brought to light that will establish a plausible basis to amend the Complaint to add such a claim. Therefore, the Court will grant H.B. Fuller's motion to the extent it seeks to amend the Complaint to add those new allegations and will deny the remainder of the motion without prejudice.

Accordingly, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Leave to Amend Complaint [Doc. No. 40] is **GRANTED IN PART AND DENIED WITHOUT PREJUDICE IN PART** as set forth herein.

Dated: August 24, 2018      s/ *Hildy Bowbeer*
                            HILDY BOWBEER
                            United States Magistrate Judge

---

specific damages flowing from Hamm's alleged breach of the non-compete provision of the NDA.